# UNITED STATES DISTRICT COURT
for the
District of Colorado

| | | |
|---|---|---|
| In the Matter of the Search of<br><br>(1) HP Model 2000-2c23dx Laptop Computer, Serial Number: 5CG310270H;<br>(2) LG Model MS450 Cellular Telephone, Serial Number: 503CYZP717277; and<br>(3) Emtec, Green 16 Gigabyte Thumb Drive,<br>all held in evidence and associated with FBI case 174A-DN-2135439, currently stored in the Denver, Colorado FBI Evidence Room and more fully described in Attachment A, attached hereto. | ) ) ) ) ) ) ) ) ) ) ) | Case No.   17-sw-05265-CBS |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the   State and   District of   Colorado   *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit
The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

  **X** evidence of a crime;

  **X** contraband, fruits of crime, or other items illegally possessed;

  **X** property designed for use, intended for use, or used in committing a crime;

The search is related to a violation of 26 U.S.C. §§ 5841, 5861(d), and 5871, and the application is based on these facts:

___ Continued on the attached affidavit, which is incorporated by reference.

___ Delayed notice of __ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

                        *s/ Matthew J. Dahl*
                        *Applicant's signature*

                        SA Matthew J. Dahl, FBI
                        *Printed name and title*

Sworn to before me and:   ☐ signed in my presence.
           ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:   **3:00 pm, Mar 03, 2017**                            
                                     *Judge's signature*

City and state:   Denver, CO            Hon. Craig B. Shaffer, District Court Magistrate Judge
                                  *Printed name and title*

## ATTACHMENT A

### DESCRIPTION OF LOCATION TO BE SEARCHED

The property to be searched (hereinafter and in Attachment B the "Devices") is the following three Devices:

(1) One HP Laptop Computer, Model Number: 2000-2c23dx, Serial Number: 5CG310270H;
(2) One LG Cellular Telephone, Model Number: MS450, Serial Number: 503CYZP717277, SIM Card Number: 630062, 89012, 60681, 92529, 1059F; and
(3) One Emtec Green Thumb Drive with the label "16."

The Devices are currently held in the FBI Denver Evidence Control Room, located at 8000 East 36th Avenue, Denver, Colorado.

1

## ATTACHMENT B

## **DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

For the Devices listed and described in Attachment A, the following items, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of Title 26, United States Code, Sections 5841, 5861(d), and 5871:

1. Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of Title 26, United States Code, Sections 5841, 5861(d), and 5871.

2. Any manual or instructions regarding the construction of any device constituting a firearm, as defined in Title 26, United States Code, Section 5845(a), including a pipe bomb or other destructive device;

3. Any materials, diagrams, notes, documents, or records that are related to the sale, purchase, receipt, manufacture or possession of any firearms or destructive devices, including, but not limited to, receipts, photographs, bills of sale, shipping receipts, credit card receipts, identification cards, bank statements, and correspondence discussing, requesting or confirming purchase, sale or shipment;

4. Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the Device(s) or by other means for the purpose of committing violations of Title 26, United States Code, Sections 5841, 5861(d), and 5871.

5. Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of Title 26, United States Code, Sections 5841, 5861(d), and 5871.

6. Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of Title 26, United States Code, Sections 5841, 5861(d), and 5871.

7. Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses pertaining to violations of Title 26, United States Code, Sections 5841, 5861(d), and 5871, or that show who used, owned, possessed, or controlled the Device(s).

8. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to use or ownership of the Device(s), or that aid in the identification of persons involved in violations of Title 26, United States Code, Sections 5841, 5861(d), and 5871.

9. Credit card information, bills, and payment records pertaining to violations of Title 26, United States Code, Sections 5841, 5861(d), and 5871.

10. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of Title 26, United States Code, Sections 5841, 5861(d), and 5871.

11. Evidence of who used, owned, or controlled the Device(s) to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were created, edited, or deleted, including photographs, videos, logs, call logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence.

12. Evidence of software that may allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security provisions or software designed to detect malicious software or unauthorized use of the device, and evidence of the lack of such malicious software.

13. Evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence.

14. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s).

15. Evidence of how and when the Device(s) were used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

16. The telephone number, ESN number, serial number, and/or SIM card numbers of or contained in the Device(s).

17. Passwords, encryption keys, and other access devices that may be necessary to access the Device(s).

18. Contextual information necessary to understand the evidence described in this attachment.

### DEFINITIONS:

19. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

## AFFIDAVIT

I, Matthew J. Dahl, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent of the Federal Bureau of Investigation, and have been since June of 2004. As part of my duties, I investigate criminal violations relating to domestic counter-terrorism, including violations pertaining to the illegal use and possession of firearms and explosive devices, in violation of Title 26, United States Code, Sections 5841, 5861(d), and 5871. I have received training and instruction in the field of the investigation of domestic terrorism and illegal acts related to firearms and improvised explosive devices.

2. This affidavit is submitted in support of an application for a search warrant for computers and related equipment (more fully described in Attachment A), and the data located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of Title 26, United States Code, Sections 5841, 5861(d), and 5871.

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 26, United States Code, Sections 5841, 5861(d), and 5871 are located in the place described in Attachment A.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

### IDENTIFICATION OF THE DEVICE(S) TO BE EXAMINED

5. Several items are held in evidence at the FBI Evidence Room in Denver, Colorado, which were found in the hotel room vacated by ADAM NAUVEED HAYAT (Hereinafter: "Hayat") following

his arrest for the illegal possession of pipe bombs and seized pursuant to a federal warrant to search the hotel room where Hayat had been staying. They are all being held in evidence under case number 174A-DN-2135439. The items include: (1) HP 2000 Laptop, SN: 5CG310270H; (2) LG Model MS450 Cellular Telephone, SN: 503CYZP717277; (3) Emtec Green 16gigabyte thumb drive, hereinafter and in Attachments A and B the "Devices."

6. Your Affiant believes there is probable cause to believe that the Devices are or contain evidence, fruits, and instrumentalities of violations of Title 26, United States Code, Sections 5841, 5861(d), and 5871. The applied-for warrant would authorize the forensic examination of the Device(s) for the purpose of identifying electronically stored data particularly described in Attachment B.

7. The Devices are currently in the lawful possession of the FBI. They came into the FBI's possession in the following way: the devices were found in a lawful search of the hotel room vacated by Hayat after Hayat's arrest for the illegal possession of pipe bombs.

8. The Devices are currently in storage at 8000 East 36th Ave, Denver, Colorado. In my training and experience, I know that the Devices all have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the FBI.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

9. Based on my training and experience, your Affiant knows about the following items, hereinafter and below and in the Attachments "Devices."

10. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and

storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts. Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They may also include GPS technology for determining the location of the device. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data. Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. Some cellular telephones also operate as a "tablet," or mobile computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.

11. A hard disk drive ("HDD"), also known as a hard drive or hard disk, is a data storage device that consists of an external circuit board, external data, power connections, and internal glass, ceramic, or magnetically charged rotating metal platters that permanently store data even when powered off. A solid-state drive ("SSD"), also known as a solid-state disk, is a data storage device that uses

3

integrated circuit assemblies as memory to permanently store data instead of using rotating platters. Flash drives, flash cards, and thumb drives are digital storage devices that can connect to computers or other devices using the appropriate connection. CDs/DVDs are digital storage devices capable of storing large amounts of digital data—a user can store information onto a CD/DVD by "burning" digital data to the device using a computer CD/DVD drive. These devices are capable of storing any electronic information including images, videos, word processing documents, programs and software, and web pages.

12. A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

13. "Computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and can include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

14. Based on my knowledge, training, and experience, your Affiant knows that computers and digital storage devices can store information for long periods of time. Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

15. Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

16. There is probable cause to believe that things that were once stored on the Device(s) may still be stored there, for at least the following reasons:

    A. Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    B. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    C. Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

5

    D. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

17. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Device(s) that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device(s) were used, the purpose of the use, who used the Device(s), and when. There is probable cause to believe that this forensic electronic evidence might be on the Device(s) because:

    E. Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

    F. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

6

G. A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

H. The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

I. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

J. Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: information related to obtaining the materials for and the instruction on how to manufacture explosive devices. The Devices may also contain plans of what the potential use of the explosive devices were manufactured for. Further the Devices may contain information on any co-conspirators.

K. Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

L. A single compact disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Thumb drives with a capacity of 32 gigabytes are not uncommon. Flash cards with a capacity of 32 gigabytes are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3 terabytes are not uncommon. These drives can store thousands of images and videos at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with video capture capabilities, and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime". Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

18. *Need to review evidence over time and to maintain entirety of evidence.* Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid,

active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

19. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the Device(s) consistent with the warrant. The warrant I am applying for would authorize a later

examination and perhaps repeated review of the Device(s) or information from a copy of the Device(s) consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device(s) to human inspection in order to determine whether it is evidence described by the warrant.

## INVESTIGATION

20. On February 16, 2017, United States Magistrate Judge Nina Y. Wang in the District of Colorado authorized an arrest warrant for Adam Nauveed Hayat based on a criminal complaint charging him with possession of firearms not registered with the National Firearms and Registration and Transfer Record, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. That complaint affidavit contained information as follows:

    a. On February 16, 2017, Denver Police Officer Jose A. Manriquez 14084 responded to 1550 Court Place Room #1902, The Sheraton Hotel, which is in the City & County of Denver, State of Colorado, on a report of a suspicious occurrence involving explosives.

    b. Officer Manriquez wrote in his statement that when he walked into room #1902 at the Sheraton Hotel he first noticed the word "explosives" written on the closet door mirror. Officer Manriquez then wrote that he looked inside the safe, which was inside the hotel room closet, and observed a closed ammunition can. Upon noticing metal pipes on the hotel room floor Officer Manriquez decided to exit the hotel room and wait for the bomb squad. While waiting for the bomb squad Officer Manriquez asked hotel staff for a print out of information on the hotel guest whom was staying in room 1902. The hotel staff checked the hotel receipt for that room and identified the hotel guest in that room as Adam Nauveed Hayat.

    c. Denver Police Officer Andrew Landon 13077 also responded and wrote in his statement that he was dispatched to the Sheraton Hotel Room 1902 on a report of a suspicious incident. Upon walking into the hotel room 1902 Officer Landon wrote that he observed writing on the glass mirror closet door indicating that there was a bomb in the closet. Officer Landon

      observed the green ammo can in the hotel room safe and multiple shell casings and flammable liquids.

d. Once on scene Detective Bishop noticed several metal pipes, empty rifle shell casings, and the words "explosive incident" written on the sliding closet door mirror. Detective Bishop then watched as an explosive detection canine was deployed inside the hotel room. The explosive canine alerted positively to possible explosive/energetic material inside the closet of the hotel room.

e. Detective Bishop then formulated a plan to safely remove the green ammunition can from the hotel room safe and transport it to the Denver Police Department Bomb Range. At the bomb range, Detective Bishop used a remote render safe procedure to open the ammunition can. Detective Bishop then approached the open ammunition can and removed 2 suspected metal pipe bombs and 4 suspected grey colored pvc pipe bombs. Each suspected pipe bomb/improvised explosive device was rendered safe, documented, and collected for evidence.

f. Detective Kurt Peterson and Detective Bishop conducted a flame test on the white, black, and gray granular material found inside one of the pipe bombs. Because of the flame test the granular material burned and sporadically sparked which indicated the granular material was energetic in nature. The same granular material was removed from each improvised explosive device.

g. Detective Michael Walsh of the Denver Police Department Bomb Squad assisted the Denver Police Department Crime Lab with processing the hotel room 1902 for evidence. Detective Walsh located numerous personal documents inside the hotel room that belonged to the suspect, Hayat, Adam N. The documents located were Denver Probate Court paperwork, Denver Health and Hospital paperwork, and Bass Pro Shop paperwork (firearms transaction record), each of which had the suspects name listed on it.

    h. An email written by Special Agent Rebecca Sauerhaft of the Bureau of Alcohol Tobacco and Firearms, confirmed that Adam Nauveed Hayat did not register the devices with the National Firearms Registration and Transfer Record.

21. A short time after the arrest warrant was issued, FBI agents executed the warrant and took Hayat into custody outside of Room 1031 of a Holiday Inn Hotel located in Los Angeles, California.

22. On February 16, 2017, following Hayat's arrest, United States Magistrate Judge Gail J. Standish in the Central District of California issued a search warrant authorizing the search of Hayat's Holiday Inn hotel room and the seizure of certain evidence, including the laptop computer and flip style phone further described in Attachment A. The warrant did not authorize the search of these electronic devices. The affidavit in support of the search warrant contained the following information, in addition to information contained in the complaint affidavit:

    a. A manager of the Holiday Inn Hotel confirmed that Hayat was staying in Room 1031 on February 16, 2017.

    b. Due to concerns of the presence of explosives, based on information from Denver Police Department, investigators performed a public safety sweep of the hotel room immediately after Hayat's arrest outside of the room. During the public safety sweep, the following observations were made: In a suitcase on the floor, there was a hatchet, hammer, at least two knives, a vile with marijuana, a laptop computer, a stack of papers and manila envelopes, a leather wallet, a box with two Zippo style lighters, and a silver keychain from Tiffany's with the inscription "Wendy." On the desk was a pipe commonly used to smoke marijuana, remnants of what appeared to be consumed marijuana, and a dark glass jar with an eye dropper inside. On the bed was a vest with a knife in the pocket. On the chair was a small bag containing a trauma medical kit and freeze dried camping food. Additionally, the room smelled of marijuana. No explosive devices were identified.

    c. After his arrest, Hayat was transferred to a local police station where he was advised of his Miranda rights by Special Agents of the FBI. Hayat agreed to waive his rights and speak

12

with law enforcement. Prior to the interview, while he was waiting in an interview room, Hayat was observed to be talking to himself and acting somewhat erratically. Hayat may have a history of mental illness. However, during the interview, Hayat appeared to understand investigators' questions and was able to answer them coherently.

d. During the interview, Hayat acknowledged that the pipe bomb/improvised explosive devices found in Sheraton Hotel Room 1902 in Denver, Colorado, belonged to him. Hayat stated that he constructed the devices in order to blow himself up and that he intended to go to Pueblo, Colorado, in order to do so but later changed his mind. Hayat described how he manufactured the devices and provided some information about where he obtained instructions and materials. Hayat further admitted to learning how to make explosive devices from a Vietnam veteran. Hayat learned to use Vaseline on the threading of pipe so as to not create a spark when connecting the end caps to piping of a pipe bomb. Additionally, Hayat was taught to use a wick in the construction of an explosive device. A knife or other bladed object could be utilized to cut such a wick or other components necessary in constructing an explosive device. Hayat learned that the powder from rifle ammunition could be extracted and utilized in the construction of explosive devices. Hayat learned that kerosene and plastic tubing could be utilized in constructing an explosive device and that many of the components required for constructing an explosive device could be purchased at stores such as Home Depot, Walmart, and other stores selling household items.

e. Hayat further stated that he had a laptop computer, a flip style cellular telephone, a hatchet, knives, and a blunt force object in his hotel room in the Holiday Inn Hotel, where he was arrested. Hayat added that he had not used the computer in the last six months.

23. FBI agents executed the search of Hayat's hotel room and located and seized the three Devices, more fully identified in Attachment A, along with other items. Although a search of the Devices was not permitted by the search warrant, the LG cellular telephone was scanned for malicious software and a cursory review of the cellular telephone was conducted on scene. The seizing

13

agents also created digital images of the thumb drive and HP laptop computer. The images were created in a misguided attempt to preserve the data in case the Devices were lost during the transport of the Devices to the FBI Denver field office. From my training and experience, I know that none of the actions taken with respect to the Devices should have altered the Devices themselves or the data stored on them. The digital images of the thumb drive and computer have not been searched and will be maintained and preserved by the FBI.

24. I know from my training and experience that individuals who manufacture improvised explosive devices often consult with internet website reference materials such as the Anarchist Cookbook and other sites where the construction of improvised explosive devices, to include pipe bombs, is detailed. I am also aware that individuals who manufacture improvised explosive devices often view and glean information on the manufacture and use of improvised explosive devices through YouTube and other sites where video instruction and demonstrations of the manufacture and detonation of the devices can be viewed.

25. Based on Hayat's account about how he learned to construct the explosive devices, it is reasonable to believe that the Devices may contain evidence of Hayat's research into the components of the pipe bombs, where to obtain these components, how to construct said pipe bombs, the expected results of the detonation of the pipe bombs, potential co-conspirators into the construction, use and possession of the pipe bombs, and identification of any potential target of Hayat or co-conspirators or accomplices. It is further reasonable to believe, based on Hayat's account that he was in contact with a person, described as a "Vietnam Veteran," who provided instruction to him on the manufacture of the pipe bombs, it is reasonable to believe that the Devices may contain such communications.

26. I also know from training and experience that persons that correspondence between persons buying firearms and destructive devices often occurs by e-mail or text messages sent to and from cellular telephones, laptops, or other digital devices. This includes sending photos of the firearms and destructive devices between the seller and the buyer, as well as negation of price. Further,

persons who travel with a computer typically use that computer to make travel arrangements, conduct internet searches, and other business. I also know that computers tend to have information contained within them that can be used to identify the user of the computer.

27. Further, although Hayat stated in his interview that he had not used the computer in the last six months, I know from my training and experience that people may be deceptive when questioned regarding criminal matters.

## CONCLUSION

28. Based on the investigation described above, probable cause exists to believe that inside the Devices (described on Attachment A), will be found evidence, fruits, and instrumentalities of a violation of Title 26, United States Code, Sections 5841, 5861(d), and 5871 (described on Attachment B).

29. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items described in Attachment A for the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

*s/ Matthew J. Dahl*_____
Matthew J. Dahl
Federal Bureau of Investigation

Submitted, attested to, and acknowledged by reliable electronic means on this 3rd day of March, 2017.

_____
HON. CRAIG B. SHAFFER
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Julia K. Martinez, Assistant United States Attorney.